Jack Silver, Esq. SB #160575
Jsilverenvironmental@gmail.com
LAW OFFICE OF JACK SILVER
708 Gravenstein Hwy No. # 407
Sebastopol, CA 95472
Tel. (707) 528-8175

David J. Weinsoff, Esq. SB #141372
David@weinsofflaw.com
LAW OFFICE OF DAVID J. WEINSOFF
138 Ridgeway Avenue
Fairfax, CA 94930
Tel. (415) 460-9760

Attorneys for Plaintiff:
CALIFORNIA RIVER WATCH

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RIVER WATCH, an Internal Revenue Code Section 501(c)(3), non-profit, public benefit corporation,<br><br>                Plaintiff,<br>    v.<br><br>DAVID BRUCE WINERY, INC., and DOES 1 through 5, Inclusive,<br><br>                Defendants. | Case No: 3:24-cv-08299<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL PENALTIES, AND DECLARATORY RELIEF**<br>(Environmental – Clean Water Act 33 U.S.C. §§ 1251 *et seq.*) |

Plaintiff, California River Watch ("RIVER WATCH"), hereby brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*.

**I.     INTRODUCTION**

1.     This action is a citizen suit for injunctive relief, civil penalties, and remediation brought against defendants DAVID BRUCE WINERY, INC., and DOES 1 through 5, Inclusive, (collectively hereafter, "Defendants"), for failing to comply with the terms of the General Industrial Storm Water

Permit and the unlawful discharge of pollutants from the David Bruce Winery facility, located at 21439 Bear Creek Road, in Los Gatos, California ("Facility,") directly to Newell Creek, a water of the United States. In California, a non-exempt industrial facility such as that of Defendants in Santa Cruz County discharging regulated storm water and non-storm water from their property must obtain an individual National Pollutant Discharge Elimination System ("NPDES") permit, 33 U.S.C. §§ 1311, 1342, from the Central Valley Regional Water Quality Control Board ("RWQCB"), or comply with the terms detailed in NPDES *General Permit For Storm Water Discharges Associated With Industrial Activities*, No. CAS000001, State Water Resources Control Board ("SWRCB") Order No. 2-14-0057-DWQ (the "IGP"). DAVID BRUCE WINERY, INC., rather than seeking coverage under an individual NPDES permit, filed a Notice of Intent ("NOI") agreeing to comply with the terms and conditions of the IGP. The California State Water Resources Control Board ("SWRCB") processed the NOI on or about March 24, 1998 and assigned the Facility Waste Discharge Identification ("WDID") No. 3 44I013834.

2. On or about June 28, 2024, RIVER WATCH determined on information and belief that Defendants failed to comply with the requirements of the IGP, and provided its initial Notice of Defendants' violations of the CWA to (1) the Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, (3) the Executive Director of the SWRCB, and (4) to Defendant DAVID BRUCE WINERY, INC. as required by the CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of RIVER WATCH's 60-Day Notice of Violations ("NOTICE") is attached as **EXHBIT A** and incorporated by reference. Defendant DAVID BRUCE WINERY, INC., the SWRCB, and the Regional and National Administrators of the EPA all received the NOTICE.

3. More than sixty (60) day have passed since RIVER WATCH's NOTICE was served on Defendant DAVID BRUCE WINERY, INC. (and its Registered Agent), the SWRCB, and the Regional and National EPA Administrators. RIVER WATCH is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under CWA § 309(g), 33 U.S.C. § 1319(g).

//

## II. JURISDICTION

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), and 33 U.S.C. § 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-2202 (declaratory relief), 33 U.S.C. § 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d) (civil penalties).

5. Venue is also proper because Defendants' CWA violations as alleged in this Complaint have occurred and are ongoing within this District. 33 U.S.C. § 1365(c)(1).

## III. DIVISIONAL ASSIGNMENT

6. Defendants and their discharging facility reside/are located, and the events or omissions giving rise to RIVER WATCH's claims occurred in Santa Cruz County, California.

## IV. PARTIES TO THE ACTION

7. RIVER WATCH is now, and at all times relevant to this Complaint was, an Internal Revenue Code § 501(c)(3) non-profit, public benefit corporation, organized under the laws of the State of California with headquarters located in Sebastopol, California, with a mailing address of 290 South Main Street, #817, Sebastopol, California 95472. The specific purpose of RIVER WATCH is to protect, enhance, and help restore surface waters and groundwaters of California, including rivers, creeks, streams, wetlands, vernal pools, aquifers and associated environs, biota, flora, and fauna, and to educate the public concerning environmental issues associated with these environs. Members of RIVER WATCH have interests in the waters and watersheds which are or may be adversely affected by Defendants' violations of the CWA as alleged in this Complaint. Said members may use the effected waters and watershed areas for recreation, sports, fishing, swimming, hiking, photography, nature walks and/or the like. Furthermore, the relief requested herein will redress the injury in fact, likelihood of future injury, and interference with the interests of said members. Defendants' ongoing violations of the IGP and the CWA will cause irreparable harm to members of RIVER WATCH for which they have no plain, speedy or adequate remedy.

8. RIVER WATCH is informed and believes, and on such information and belief alleges, that Defendant DAVID BRUCE WINERY, INC., is now, and at all times relevant to this Complaint was a private California corporation, and the owner and operator of the Facility - a business identified

under Standard Industrial Classification ("SIC") Code 2084 ("Wine, Brandy and Brandy Spirits") located at 21439 Bear Creek Road, Los Gatos, California. The business address of DAVID BRUCE WINERY, INC. is the same as the Facility.

9. RIVER WATCH is informed and believes, and on such information and belief alleges, that Defendants DOES 1 through 5, Inclusive, respectively, are now, and at all times relevant to this Complaint were persons, partnerships, corporations and entities who are, or were, responsible for, or in some way contributed to, the violations which are the subject of this Complaint, and are or were, persons, partnerships, corporations and entities who hold a major ownership interest in the real property underlying the Facility at 21439 Bear Creek Road, Los Gatos, identified as Santa Cruz County Assessor's Parcel Number 09102108. The names, identities, capacities, and functions of Defendants DOES 1 through 5, Inclusive, are presently unknown to RIVER WATCH. RIVER WATCH shall seek leave of court to amend this Complaint to insert the true names of said DOES defendants when the same have been ascertained.

## V.    CLEAN WATER ACT

10. Congress declared that the CWA was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation, and to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and grounds waters." 33 U.S.C. §§ 1251(a), 1252(a). In furtherance of these goals, the CWA prohibits all discharges except those in compliance with an NPDES permit. 33 U.S.C. §§ 1311, 1342. The EPA promulgates regulations to implement the NPDES permitting system at 40 C.F.R. §§ 122-129.

11. Pursuant to the requirements of the CWA, the SWRCB developed a *General Permit for Stormwater Discharges Associated with Industrial Activity* ("IGP") within the State of California. 33 U.S.C. § 1342; 40 C.F.R. §122.26; NPDES Permit No. CAS000001, SWRCB Order No. 92-12-DWQ, with the most recent substantive amendments under Order No 2014-0057-DWQ. All facility operators subject to permitting not covered under another NPDES permit must apply to the SWRCB through submission of an NOI to obtain coverage, or through a No Exposure Certification ("NEC") or Notice of Non-Applicability ("NONA") for exemption from coverage under the IGP. *Id*. Failure to do so, and

failure to comply strictly with all permit requirements, violates the CWA. *Id*., *see also* IGP § XXI.Q. This Section IV of the Complaint details the requirements of the IGP.

12. The IGP requires, among other requirements, that the discharger (1) prepare, "certify and submit" an Annual Report on the year's discharge activities including compliance with the CWA and IGP (IGP § XVI), (2) perform visual observations and conduct sampling and analysis to monitor any discharges (IGP § XI), and (3) prepare a comprehensive site-specific Storm Water Pollution Prevention Plan ("SWPPP") (IGP § X).  Where a facility operator fails to "comply with all standard conditions [of the] General Permit," it shall "constitute [] a violation of the [CWA] and the Water Code and is grounds for enforcement action and/or removal from General Permit coverage." IGP § XXI.A; 33 U.S.C. §1342.

13. Under the CWA, dischargers are required, by July 15 of each year, to submit an Annual Report, based on laboratory reports, summarizing the year's monitoring and sampling, and addressing any deficiencies in those required actions.  IGP § XVI.  Failure to submit an adequate Annual Report violates the IGP and subsequently the CWA.  IGP § XXI.A; 33 U.S.C. § 1342.

14. Pursuant to IGP § XI.B, dischargers are required to monitor all discharges to ensure compliance with the provisions and purpose of the CWA.  The IGP similarly requires extensive monitoring of discharges, including visual observations, sampling, and analysis. IGP § XI.  The IGP mandates that dischargers "collect and analyze storm water samples from two (2) Qualifying Storm Event ("QSEs") within the first half of each reporting year (July 1 to December 31) and two (2) QSEs within the second half of each reporting year (January 1 to June 30)" "from each drainage area at all discharge locations." IGP §§ XI.B.2 (first quote), XI.B.4 (second quote).  Compliance group participants and dischargers qualifying for "Representative Sampling Reduction" have reduced sampling of QSEs.  IGP §§ XI.B.3; XI.C.4. and XI.C.7.  Dischargers are required to "submit all sampling and analytical results for all [samples] via [the Storm Water Multiple Application and Report Tracking System ("SMARTS")] within 30 days of obtaining all results for each sampling event."  IGP § XI.B.11.a.  Failure to comply with these IGP provisions violates the CWA.  IGP § XXI.A. ("Permit noncompliance constitutes a violation of the [CWA] and the Water Code and is grounds for enforcement action" or NPDES coverage termination); 33 U.S.C § 1342.

15. The IGP also requires dischargers to "develop and implement a site-specific SWPPP for each industrial facility covered by [the] General Permit." IGP §§ I.I.54, X.A., *see* Appendix 1. The SWPPP must contain (1) the facility name and contact information, (2) a site map, (3) a list of industrial materials, (4) descriptions of potential pollution sources, (5) an assessment of those sources, (6) minimum Best Management Practice ("BMPs"), (7) advanced BMPs if applicable, (8) a monitoring implementation plan, (9) an annual evaluation, and (10) dates when the SWPPP was prepared and amended. IGP § X.A. All of this information must be certified and submitted via SMARTS "within 30 days" of any "significant revision(s)" to the SWPPP, or no more than every 3 months in the reporting year where the revisions are not "significant." IGP §§ X.B.2., X.B.3. Missing or incomplete information requires a revision of the SWPPP.

    a. Among the many requirements for a SWPPP, a discharger "shall prepare a site map" that includes "[t]he facility boundary, storm water drainage areas within the facility boundary," and portions of any drainage area impacted by discharges from surrounding areas," "[l]ocations and descriptions of structural control measures," "[i]dentification of all impervious areas," locations of exposed materials, and "[a]reas of industrial activity subject to this General Permit." IGP § X.E3.; IGP Attachment D § F.2 (listing requirements for site maps).

    b. All dischargers are required to describe and assess each potential pollutant source in their SWPPP. IGP § X.G. "The Discharger shall ensure the SWPPP describes each industrial process," "each material handling and storage area," "all industrial activities that generate a significant amount of dust or particulate that may be deposited within the facility boundaries," a "list of any industrial materials that have spilled or leaked," all non-storm water discharges, and "the facility locations where soil erosion may" occur. IGP § X.G.1. The discharger shall also "ensure that the SWPPP includes a narrative assessment of all areas of industrial activity with potential pollutant sources." IGP § X.G.2.a. The discharger's assessment of these sources must include, among other things, the location, type, quantity and physical characteristics of the pollutant, the potential for all exposure, all sampling and inspection records, and the potential effectiveness of the current BMPs to reduce or prevent pollutants in storm water discharges. IGP § X.G.2.a.

   c. The SWPPP must also "implement and maintain" the minimum BMPs described in the IGP (IGP § X.H.1) and any advanced BMPs "necessary to reduce or prevent discharges of pollutants" (IGP § X.H.2). The discharger shall "identify and describe" the implemented BMPs on which it relies to reduce discharges. IGP § X.C.1.b. These BMPs descriptions shall include:

    i. The pollutant(s) the BMPs are designed to reduce or prevent…;

    ii. The frequency, time(s) of day, or conditions where the BMPs are scheduled for implementation;

    iii. The locations within each area of industrial activity or industrial pollutant source where the BMPs shall be implemented;

    iv. The individual and/or position responsible for implementing the BMPs;

    v. The procedures… and/or instructions to implement the BMPs effectively;

    vi. The equipment and tools necessary to implement the BMPs effectively; and,

    vii. The BMPs that may require more frequent visual observations beyond the monthly visual observations as described in IGP § XI.A.1. IGP § X.H.4.a. The minimum BMPs that are required in the SWPPP include Good Housekeeping (IGP § X.H.1.a), Preventative Maintenance (IGP § X.H.1.b), Spill and Leak Prevention and Response (IGP § X.H.1.c), Material Handling and Waste Management (IGP § X.H.1.d), Erosion and Sediment Controls (IGP § X.H.1.e), Employee Training Programs (IGP § X.H.1.f), and Quality Assurance and Record Keeping (IGP § X.H.1.g). The advanced BMPs that may be implemented as necessary include Exposure Minimization (IGP § X.H.2.b.i), Storm Water Containment and Discharge Reduction (IGP § X.H.2.b.ii), Treatment Control (IGP § X.H.2.b.iii), or other BMPs "necessary to meet effluent limitations of this General Permit." (IGP § X.H.2.b.iv).

   d. The SWPPP must be signed and certified as "true, accurate, and complete." IGP § XXI.L. An incomplete or inconsistent SWPPP violates the IGP and subsequently the CWA. IGP §§ XXI.A; 33 U.S.C. § 1342.

16. The "General Permit requires control of pollutant discharges using [Best Available Technology Economically Achievable ("BAT")] and [Best Conventional Pollutant Technology ("BCT")] to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." IGP § I.D.32. "Dischargers shall implement BMPs that comply with BAT/BCT requirements of this General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry

practice considering technological availability and economic practicability and achievability." IGP § V.A.; *see also* 40 C.F.R. § 125.3(a)(2)(i)-(v); (NPDES Permits must include technology-based treatment requirements).

17. The "General Permit incorporates discharge prohibitions contained in water quality control plans [Basin Plans], as implemented by the [Regional Water Quality Control] Boards." IGP § I.C.29.

18. Under the CWA, "any citizen may commence a civil action" "against any person…who is alleged to be in violation of (A) an effluent standard or limitation under [the CWA] or (B) an Order issued by …a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). "No action may be commenced…prior to sixty days after the plaintiff has given notice of the alleged violation to (i) the Administrator [of the EPA], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A). By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

19. In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction "to apply any appropriate civil penalties under section 1319(d)." 33 U.S.C. § 1365(a). Section 1319(d) declares that "[a]ny person who violates…any permit condition or limitation implementing any of such sections in a[n NPDES] permit… shall be subject to a civil penalty not to exceed $[66,712.00] per day for each violation." 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; IGP § XXI.Q.1.

20. Violations of provisions of the IGP, including those detailed below, constitute violations of the CWA and are subject to civil penalties. IGP § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§19.1 – 19.4.

**VI.   FACTUAL ALLEGATIONS WHICH GIVE RISE TO THE CLAIMS**

21. RIVER WATCH attempted to inform Defendant DAVID BRUCE WINERY, INC. of the requirements imposed under the IGP on two (2) separate occasions:

    a.   On June 28, 2024, RIVER WATCH through its counsel sent Defendant DAVID BRUCE WINERY, INC. the NOTICE identified in Paragraph 2 of this Complaint, a formal "Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act (Clean Water

1  Act)" via certified mail that was received by Defendant DAVID BRUCE WINERY, INC. on August 13, 2024, alleging on-going non-compliance with the CWA's requirements for the regulation of industrial stormwater discharges. Neither RIVER WATCH nor its counsel received a response from said Defendant to the Notice Letter prior to the filing of this Complaint.

b.     On October 9, 2024, RIVER WATCH through its counsel sent Defendant DAVID BRUCE WINERY, INC. a second letter via certified mail that was received and signed for by Defendant DAVID BRUCE WINERY, INC. on October 17, 2024, asserting its continuing efforts to resolve its concerns regarding on-going non-compliance with the stormwater requirements in the CWA, and reiterating its statement in the cover letter to the NOTICE: "… please contact [River Watch] to discuss the concerns raised in the Notice and possible resolutions to those issues. California River Watch prefers compliance through cooperation rather than litigation and would welcome the opportunity to work with you in this regard." Neither RIVER WATCH nor its counsel received a response from said Defendant to this letter prior to the filing of this Complaint.

22.    RIVER WATCH avers that full compliance with the mandates of the IGP is not a mere statutory and regulatory exercise. The lands in and surrounding the watershed in which the Facility is located produce a harvest of unparalleled bounty drawing acclaim worldwide. Failing to care for this critical environment as alleged in this Complaint is a violation not only of law, but an abrogation of the trust we demand of Santa Cruz County landowners.

The Facility is classified on the NOI and in the SWPPP (*revised* August 11, 2011) Section 2 ("Standard Industrial Classification and Narrative") as SIC Code 2084 ("Wines, Brandy, and Brandy Spirits"). Because there is no public record of a SWRCB or RWQCB exemption from the collecting and analyzing of the range of pollutants discharged from the Facility site, without implementing and properly reporting the full range of required sampling and analysis there is no accurate measure by which to determine whether required Best Management Practices ("BMPs") under IGP § X.H and identified in SWPPP Section A.4.1 – 4., A.5, and A.6.1 -3[1] are both implemented at the Facility and

---

[1] The SWPPP (Section 4) on SMARTS states repeatedly that anticipated new BMPs under a sub-heading "Existing BMPs – Revised New BMPs" will be imposed under "Implementation Schedule:

effective to ensure there are no unlawful discharge(s) of pollutants from the Facility to Newell Creek. The Facility's SWPPP states that areas of industrial activity include the "Outside Process Areas;" "Loading & Unloading Area(s);" "Outside Machinery Storage;" and "Outside Non-Machinery Storage" (SWPPP Section 5 "BMP Summary Table By Area/Activity - Potential Pollutant Sources/Industrial Activities/Operational Practices").

Having agreed to its terms, Defendants have a continuing burden to demonstrate compliance with each and every applicable provision of the IGP. RIVER WATCH alleges the following actions and inactions as violations of the IGP:

a. <u>Failure to Properly Sample and Monitor Storm Water Discharges</u>

Under the IGP, Defendants are required to comply with all terms of the IGP including, but not limited to, the following:

Storm water discharge samples are required to be collected from a Qualified Storm Event ("QSE") four (4) times per year – "two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30)" (IGP Section XI.B.2).[2]

RIVER WATCH, following review of the SWRCB's SMARTS reporting database, contends Defendants have failed, and continue to fail, to comply with the sampling and monitoring requirements during Annual Reporting Years 2019-2020 through 2023-2024 as follows:

<u>Annual Reporting Year 2023-2024</u>:

In violation of the IGP, no Annual Report or sampling data was reported on SMARTS.

<u>Annual Reporting Year 2022-2023</u>:

- In violation of the IGP, only two (2) of the four (4) storm water samples required were reported on SMARTS. The Facility "certified" on the Annual Report in response to

---

By the start of the 2001-2002 official wet season." River Watch was unable to identify these "Revised New BMPs" in a SWPPP on the SMARTS database.

[2] River Watch notes the most current SWPPP available on SMARTS, predating SWRCB Order No. 2014-0057-DWQ, does not include these sampling requirements. SWPPP Section B.4 "Storm Water Monitoring Plan – Storm Water Sampling and Analysis" currently requires storm water samples "during the first rainstorm or the storm water season (October -May) and from one additional rainstorm before May 31."

- Question Information #3 that it "sample[d] the required number of Qualifying Storm Events during the reporting year for all locations, in accordance with Section XI.B," but provided no explanation in the Annual Report "Summary of Explanations" for its alleged failure to do so.

- The Facility's laboratory reports on SMARTS identify sample dates of December 1, 2022, and December 27, 2022. The Soil Control Lab December 1st report states sampling occurred at 9:30 am from Culvert 1 and 9:50 am from Culvert 2. The Soil Control Lab December 22nd report states sampling occurred at Discharge #1 and Discharge #2 at the same sample time, 10:20 am. No document on SMARTS provides the "Estimated Discharge Date/Time." In the absence of this Date/Time, it is not possible to accurately determine whether any of the samples were collected within four (4) hours of "[t]he start of the discharge; or, [t]he start of facility operations if the QSE occurs within the previous 12-hour period (e.g., for storms with discharges that begin during the night for facilities with day-time operating hours) …" as required by IGP § XI.B.5.

- The certified Annual Report is dated August 10, 2023, in violation of IGP § XVI.A, which requires that "[t]he Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year …"

Annual Reporting Year 2021-2022:

- In violation of the IGP, only three (3) of the four (4) storm water samples required were reported on SMARTS. The Facility "certified" on the Annual Report in response to Question Information #3 that it "sample[d] the required number of Qualifying Storm Events during the reporting year for all locations, in accordance with Section XI.B," but provided no explanation in the Annual Report "Summary of Explanations" for its alleged failure to do so.

- The Facility's "Annual Report Form 4 (Continued) – Monthly Visual Observations of Storm Water Discharges" on SMARTS identifies sample dates of October 25, 2021, January 3, 2022 and April 11, 2022. The report states that the October 25th sampling occurred at both Discharge #1 and Discharge #2 at the same sample time, 11:30 am; that the January 3rd sampling occurred at both Discharge #1 and Discharge #2 at the same sample time, 10:15 am; and that the April 11th sampling occurred at both Discharge #1 and Discharge #2 at the same sample time, 8:00 am. Neither the "Annual Report Form 4" nor any other document on SMARTS provides the "Estimated Discharge Date/Time." In the absence of this Date/Time, it is not possible to accurately determine whether any of the samples were collected within four (4) hours of "[t]he start of the discharge; or, [t]he start of facility operations if the QSE occurs within the previous 12-hour period (e.g., for storms with discharges that begin during the night for facilities with day-time operating hours) …" as required by IGP § XI.B.5.

Annual Reporting Year 2020-2021:

- In violation of the IGP, only one (1) of the four (4) storm water samples required were reported on SMARTS. The Facility "certified" on the Annual Report in response to

Question Information #3 that it "sample[d] the required number of Qualifying Storm Events during the reporting year for all locations, in accordance with Section XI.B," but provided no explanation in the Annual Report "Summary of Explanations" for its alleged failure to do so.

- The Facility's laboratory report on SMARTS identifies a sample date of January 27, 2021. The Soil Control Lab January 27th report states sampling occurred at Discharge #1 at 9:20 am and at Discharge #2 at 9:25 am. No document on SMARTS provides the "Estimated Discharge Date/Time." In the absence of this Date/Time, it is not possible to accurately determine whether the sample was collected within four (4) hours of "[t]he start of the discharge; or, [t]he start of facility operations if the QSE occurs within the previous 12-hour period (e.g., for storms with discharges that begin during the night for facilities with day-time operating hours) …" as required by IGP § XI.B.5.

Annual Reporting Year 2019-2020:

- In violation of the IGP, only one (1) of the four (4) storm water samples required were reported on SMARTS. The Facility stated in Annual Report Question Information #3 ("Summary of Explanations") that "DBW sampled one storm water event in December 2019. Starting March of 2020 the winery has been on minimal staff & major winemaking operations have stopped." RIVER WATCH alleges that during the Annual Reporting year, QSE(s) occurred during the first half of the annual reporting year and the initial months of the second half of the annual reporting year during the Facility's operating hours sufficient to monitor and collect the full complement of required storm water samples.

- The Facility's laboratory report on SMARTS identifies a sample date of December 2, 2019. The Soil Control Lab December 2nd report states sampling occurred at both Discharge #1 and Discharge #2 at the same sample time, 11:00 am. No document on SMARTS provides the "Estimated Discharge Date/Time." In the absence of this Date/Time, it is not possible to accurately determine whether the sample was collected within four (4) hours of "[t]he start of the discharge; or, [t]he start of facility operations if the QSE occurs within the previous 12-hour period (e.g., for storms with discharges that begin during the night for facilities with day-time operating hours) …" as required by IGP § XI.B.5.

- The certified Annual Report is dated August 13, 2020, in violation of IGP § XVI.A, which requires that "[t]he Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year …"

b. <u>Failure to Sample for Full Range of Potential Pollutants</u>

RIVER WATCH, following review of the Facility's Annual Reports for the 2019-2020 through 2022-2023 annual reporting years, and the SWPPP provisions identifying the Facility's procedures for sampling and monitoring of storm water discharges (*see* SWPPP Section B), contends Defendants, when conducting sampling and monitoring, fail to sample and monitor for the full range of potential pollutants required by the IGP.

The IGP provides in Section X.G.2.a.ii. that a "Discharger shall ensure that the SWPPP includes a narrative assessment of all areas of industrial activity with potential pollutant sources. At a minimum, the assessment shall include: … [t]he pollutants likely to be present in industrial storm water discharges and authorized NSWDs." In addition to the above, the IGP provides in Section III.C. "Discharge Prohibitions" that "[i]ndustrial storm water discharges and authorized NSWDs that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the Water Code, are prohibited." Water Code § 13050 provides, in relevant part:

> (e) "Waters of the state" means any surface water or groundwater, including saline waters, within the boundaries of the state.
>
> (k) "Contamination" means an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease. "Contamination" includes any equivalent effect resulting from the disposal of waste, whether or not waters of the state are affected.
>
> (l) (1) "Pollution" means an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects either of the following:
>  (A) The waters for beneficial uses.
>  (B) Facilities which serve these beneficial uses.
>  (2) "Pollution" may include "contamination."
>
> (m) "Nuisance" means anything which meets all of the following requirements:
> (1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property.
> (2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.
> (3) Occurs during, or as a result of, the treatment or disposal of wastes.

RIVER WATCH alleges that the discharge of the potential pollutants copper and zinc from industrial sources, such as on-site materials containing zinc or copper and transportation-related activities taking place at the Facility, are above California Toxics Rule limits and therefore prohibited as "contamination" or "nuisance" under the IGP. RIVER WATCH asserts that targeted monitoring/sampling is required at the Facility site (including parking lots, vehicle storage area(s), or other transportation surfaces) to determine whether, and if so to what extent, zinc and copper are being

discharged from the Facility to Newell Creek.³ As noted in paragraph 22 above, the SWPPP for the Facility states that areas of industrial activity include the "Outside Process Areas"; "Loading & Unloading Area(s)"; "Outside Machinery Storage"; and "Outside Non-Machinery Storage" (SWPPP Section 5 "BMP Summary Table By Area/Activity - Potential Pollutant Sources/Industrial Activities/Operational Practices").

In the absence of any sampling for zinc or copper at the Facility, however, it is not possible to determine whether the considerable number of vehicles, both owned/operated and maintained by Defendants or their contractors and employees, as well as those driven separately by private vendors involved in industrial activities at the Facility site, are adequately maintained.

  c. <u>Failure to Ensure Employees are Properly Trained</u>

The IGP's minimum BMPs require each discharger to maintain an Employee Training Program. The IGP mandates that "[t]he Discharger shall: i. Ensure that all team members implementing the various compliance activities of this General Permit are properly trained to implement the requirements of this General Permit, including but not limited to: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities …" (IGP § X.H.1.f.i). The Facility's SWPPP (Section 6.4 "Employee Training") states that it "has an existing program of employee training," but fails to contain comprehensive provisions detailing an employee training program. The failure to comply with the requirements of the IGP, as specifically detailed above in Section IV of this Complaint, resulted in Defendants violating and continuing to violate IGP § X.H.1.f.i.

  d. <u>Potential Failure to Monitor Discharges from On-Site Ponds</u>.

RIVER WATCH is concerned that the pond located at the Facility site, identified in the SWPPP as a "lined wastewater treatment pond" (SWPPP Section 4.4.7), may be insufficient to hold all

---

³ River Watch notes the IGP provides no blanket exclusion for on-site vehicle use. The IGP, Appendix 2 ("Instructions For No Exposure Certification (NEC)" mirrors text from the EPA's "Guidance Manual for Conditional Exclusion from Storm Water Permitting Based on 'No Exposure' of Industrial Activities to Storm Water" (EPA 833-B-00-001, June 2000) to provide that "Adequately maintained vehicles" are among the list of "Industrial Materials/Activities Not Requiring a Storm-Resistant Shelter" (*see,* Appendix 2.B.4.d.).

regulated storm water prior to evaporation, any reuse or recycling at the Facility; or if not properly lined may discharge regulated storm water to surface or groundwater. In the absence of sampling to ensure there is no discharge of industrial storm water from the "pond," for example, RIVER WATCH asserts Defendants would be incorrect in answering "No" to Annual Report Question Information #10 on the Annual Reports which inquires "Has any contained storm water been discharged from the facility this reporting year?" RIVER WATCH asserts that sampling of any industrial storm water is required at the point of discharge from the Facility site.

    e. <u>Failure to Prepare and Implement an Adequate SWPPP and Site Map</u>

The SWPPP for the Facility fails, in the absence of a comprehensive updated "Monitoring Implementation Plan" (IGP § X.A.8), to test for all parameters associated with the facility-specific industrial pollutants. For example, while transportation activities take place at the Facility, the SWPPP fails to require testing for zinc and copper which are known pollutants associated with tires, brake pads, fuels and lubricants.

The Facility Site Maps, which state that they were revised July 11, 2022 (*see* SMARTS Attachment ID 346275) fail to clearly and comprehensively include all of the requirements of IGP § X.E "appropriate to ensure the map[s are] clear, legible and understandable." Specifically, the maps do not "[i]dentify all industrial storage areas and storage tanks, shipping and receiving areas and storage tanks, fueling areas, vehicle and equipment storage/maintenance areas, material handling and processing areas, waste treatment and disposal areas, dust or particulate generating areas, cleaning and material reuse areas, and other areas of industrial activity that may have potential pollutant sources" (IGP § X.E.3.f).

**VII.   CLAIM FOR RELIEF**

    **Violations of the CWA Pursuant to CWA § 505(a)(1)(B), 33 U.S.C. § 1365(a)(1)(B) – Failure to Comply with CWA Requirements for Industrial Discharges and Violation of NPDES Permit No. CAS000001, the IGP.**

23.    Each and every allegation set forth in this Complaint is incorporated herein by reference.

24.    Each day since June 28, 2019, Defendants have failed and continue to fail to comply with the NPDES permitting requirements of the CWA, and in particular the IGP, because Defendants have

failed and continue to fail to comply with the substantive storm water IGP requirements detailed in Paragraphs 10 through 22 of this Complaint. These violations are on-going.

25. Each day since June 28, 2019, on which unauthorized storm water discharges, non-storm water discharges ("NSWDs"), liquids, or materials other than storm water are discharged from the Facility either directly or indirectly to waters of the United States, Defendants are violating the IGP and the CWA. These violations are on-going.

26. Each day since June 28, 2019, on which storm water discharges and/or NSWDs containing pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of the California Water Code are discharged from the Facility, Defendants are violating the IGP and thus the CWA. These violations are on-going.

27. Each day since June 28, 2019, on which discharges from the Facility violate any discharge prohibitions contained in the applicable RQWCB Basin Plan, or statewide water quality control plans and policies, Defendants are violating the IGP and thus the CWA.

28. Noncompliance with the IGP constitutes a violation of the CWA. IGP § XXI.A; 33 U.S.C. § 1342. These violations are on-going.

## VIII. RELIEF REQUESTED

Wherefore, RIVER WATCH respectfully requests that this Court grant judgment providing the following relief:

29. Declare Defendants to have violated and to be in violation of the CWA;

30. Issue an injunction ordering Defendants to immediately operate the Facility in compliance with the NPDES permitting requirements of the CWA;

31. Enjoin Defendants from discharging pollutants from the Facility and to the surface waters or groundwaters surrounding the Facility in violation of the CWA;

32. Order Defendants to pay civil penalties of up to $66,712.00 per day/per violation for each violation of the CWA pursuant to 33 U.S.C. §§1319(d), 1365(a), and 40 C.F.R. §§ 19.1-19.4;

33. Order Defendants to take appropriate actions to restore the quality of United States waters impaired by industrial activities taking place at the Facility;

34. Order Defendants to pay RIVER WATCH's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law; and

35. Award such other and further relief as may be just and proper.

DATED: November 20, 2024         LAW OFFICE OF JACK SILVER

                                                          By:   *s/ Jack Silver*
                                                               Jack Silver

                                             LAW OFFICE OF DAVID J. WEINSOFF

                                             By:   *s/ David J. Weinsoff*
                                                                  David J. Weinsoff

                                             Attorneys for Plaintiff
                                             CALIFORNIA RIVER WATCH